IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

VICKI M. DICKERSON,

    Plaintiff,

v.                                      CASE NO. 2:06-cv-00921

MICHAEL J. ASTRUE,
Commissioner of Social Security[1],

    Defendant.

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the court on cross-motions for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Vicki M. Dickerson (hereinafter referred to as "Claimant"), protectively filed applications for SSI and DIB on July 13, 2004, alleging disability as of January 6, 2002, due to a back injury and arthritis in her knees. (Tr. at 13, 54-56, 81.) The

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

claims were denied initially and upon reconsideration. (Tr. at 30-32, 36-38.) On June 8, 2005, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 39.) The hearing was held on January 5, 2006, before the Honorable Harry C. Taylor. (Tr. at 271-304.) By decision dated May 23, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-22.) The ALJ's decision became the final decision of the Commissioner on September 1, 2006, when the Appeals Council denied Claimant's request for review. (Tr. at 6-8.) On October 31, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is

2

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 15.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of "lumbar strain and chronic pain, degenerative osteoarthritis of knees, GERD (gastroesophageal reflux disease), hiatal hernia, status post cholecystectomy 2001, depression, and drug and alcohol dependence in remission." (Tr. at 15-16.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 16-20.) As a result, Claimant cannot return to her past relevant work. (Tr. at 20-21.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as a laundry folder, a packager, and a shirt presser, which exist in significant numbers in the national economy. (Tr. at 21-22.) On this basis, benefits were denied. (Tr. at 22.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular

4

> conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was forty-six years old at the time of the administrative hearing. (Tr. at 273.) She earned a GED. (Tr. at 277.) At the time of the administrative hearing, Claimant was working approximately twenty-five hours per week as a cashier at Rite Aid. (Tr. at 275-76, 291.) Claimant's previous jobs included a Certified Nursing Assistant ("CNA") at Saint Francis Hospital, a dietary aide at Charleston Area Medical Center, a fast food worker, and a cashier. (Tr. at 82, 104, 278-79, 296-97.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

On October 18, 2000, an MRI of Claimant's right knee showed "deformity of the lateral meniscus, which may be related to chronic tear," "probable myxoid degeneration versus intrasubstance tear in the posterior horn of the medial meniscus," and "ossified loose body with osteochondral type injury . . . laterally." (Tr. at 136.)

On March 22, 2001, Bruce F. Haupt, M.D., an orthopedist, examined Claimant and noted a range of motion in her right knee of zero to 160 degrees, posterior lateral pain with hyper flexion, grade I effusion, and audible and palatable subluxation of the lateral meniscus with knee flexion associated with pain.(Tr. at 154.) Dr. Haupt's impression was "[r]ight knee lateral meniscus tear" and "[v]algus alignment." Id. He recommended arthroscopic surgery and advised Claimant to anticipate four to six weeks off work for post-operative rehabilitation. Id.

On May 24, 2001, Claimant told Dr. Haupt that she did not want to undergo knee surgery because she was concerned about "job security." (Tr. at 153.) Dr. Haupt injected Claimant's right knee with cortisone and "strongly recommended consideration of arthroscopy." Id. He noted that she had "continued to work, using no pain medications." Id.

On January 6, 2002, Claimant went to the emergency room at

6

Saint Francis Hospital with complaints of ankle and back pain after she tripped and fell at work. (Tr. at 146-47.) The clinical impression was neck and lumbar sprain/strain and left ankle sprain. (Tr. at 148.) Claimant was discharged to home with instructions to rest, elevate, and ice her ankle and to refrain from heavy lifting. Id. Norflex and Naprosyn were prescribed, and Claimant was given a "work excuse" for two days. Id.

On January 9, 2002, Claimant began undergoing chiropractic treatments, which she continued until August 20, 2003. (Tr. at 156-61.)

On May 23, 2002, Claimant went to the emergency room at Saint Francis Hospital with a complaint of back pain. (Tr. at 138-41.) A physical examination revealed negative straight leg raising bilaterally, no apparent motor or sensory deficit, and normal reflexes. (Tr. at 139.) An x-ray of Claimant's abdomen was negative. (Tr. at 182.) The diagnosis was back pain not otherwise specified. (Tr. at 144.) Lortab was prescribed, and Claimant was discharged to home. Id.

From May 24, 2002, to September 13, 2004, Claimant received treatment from Melissa J. Gamponia, M.D. at Charleston Area Family Health Associates for GERD, right knee pain, and back pain. (Tr. at 162-82, 205-35, 256.) Dr. Gamponia prescribed Lortab, and Claimant said that it helped. (Tr. at 163-71.)

On September 24, 2002, an upper gastrointestinal exam showed

a "[s]mall sliding reducible hiatal hernia with gastroesophageal reflux." (Tr. at 181.) There was "[n]o evidence of peptic ulcer disease." Id.

On May 22, 2003, Claimant told Dr. Haupt that she wanted to proceed with arthroscopic surgery as an outpatient. (Tr. 153). The surgery was scheduled but then cancelled due to an "insurance problem." (Tr. at 166.)

On September 13, 2004, Dr. Gamponia noted that Claimant "did not show" for an office appointment with Dr. Haupt and had been "noncompliant" in that she had not kept any appointments with specialists. (Tr. at 163, 207.)

On October 20, 2004, Nilima Bhirud, M.D. evaluated Claimant at the request of the State disability determination service ("DDS"). (Tr. at 183-88.) On physical examination, Claimant could pick up a coin from the floor, do heel and toe walking, and squat halfway. (Tr. at 184.) Her gait was normal, and she was comfortable in a standing position. Id. Claimant's cervical spine revealed no tenderness, and range of motion was normal. (Tr. at 185.) Her thoracic spine was nontender, and she had no scoliosis or kyphosis. Id. Claimant had "mild tenderness" in her lumbar spine. Id. A straight leg raising test was negative on both sides. Id. Claimant's right knee was swollen and tender, and there was crepitus over the right knee, but range of motion was normal. Id. Claimant's left knee was tender, but there was no swelling. Id.

8

Her hand joints, elbows, shoulders, hips, and ankles were all normal. Id.

On December 9, 2004, James K. Egnor II, M.D. completed a Physical Residual Functional Capacity Assessment form at the request of DDS. (Tr. 189-96). Dr. Egnor opined that Claimant was capable of light work with the nonexertional limitations of no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and a need to avoid concentrated exposure to extreme cold and vibration. (Tr. 190-91, 193-94.)

On February 4, 2005, x-rays of Claimant's pelvis showed "no acute fracture" and "a residual deformity of the ischiopubic rami bilaterally consistent with old healed fractures." (Tr. at 232.) The same date, x-rays of her lumbar spine showed "mild lumbar scoliosis convex to the left" and "sacralization of L5 vertebral body with intervertebral disc space narrowing at the L5-S1 level." (Tr. at 234.)

On April 7, 2005, Rogelio T. Lim, M.D. completed a Physical Residual Functional Capacity Assessment form at the request of DDS. (Tr. at 197-204.) Dr. Lim opined that Claimant could perform light work with the nonexertional limitations of no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and a need to avoid concentrated exposure to vibration and hazards. (Tr. 198-99, 201.)

In September 2005, Claimant had three office visits with Dr. Gamponia. (Tr. at 253-56.) Claimant complained of a rash on her hands and "bottom," and treatment related only to the rash. Id.

On December 26, 2005, Mareda L. Reynolds, M.A., a licensed psychologist, evaluated Claimant at the request of her attorney. (Tr. at 261-70.) Claimant related a subjective feeling of depression and stated that she had thoughts of killing herself but no plan or intent. (Tr. at 262.) Claimant reported that she first sought mental health treatment in October 2005, but treatment was discontinued because Medicaid would not pay for the service. (Tr. at 263.) She had never been hospitalized for mental health treatment. Id. Claimant reported that she had last consumed alcohol two days before the evaluation, and she estimated her weekly alcohol consumption to be two pints of vodka. Id. By self-report, Claimant used crack cocaine and marijuana from 1995 to 2000, and she last used illicit drugs approximately one year before the evaluation. Id. She reported smoking approximately four cigarettes per day. Id. Ms. Reynolds noted that Claimant walked with no adaptive or assistive devices. (Tr. at 264.) During the mental status examination, Claimant's social interaction was moderately impaired; her mood was irritable; her affect was moderately constricted; she denied homicidal or suicidal ideation at that time; her speech was normal; she was alert and oriented; her insight and judgment were poor; her immediate memory was normal;

10

her recent memory was moderately deficient; her remote memory was fair; her concentration and attention were mildly deficient; she worked at an even pace; and she was able to persist throughout the interview. (Tr. 264-65.) Claimant's self-reported daily activities included working a seven-hour shift at Rite Aid, watching television, cleaning her house, cooking, paying bills without assistance, doing laundry, and going to the post office. (Tr. at 264-65.) Socially, Claimant reported talking with her family on the telephone daily, but said she did not have visitors in her home and avoided social interaction with others. (Tr. at 265.) Ms. Reynolds diagnosed major depressive disorder, recurrent, moderate; alcohol dependence, in partial remission; and cannabis and cocaine dependence in full remission. (Tr. at 266.) She opined that Claimant's prognosis was "fair." Id.

On December 30, 2005, Ms. Reynolds completed a Mental Assessment of Ability to do Work-Related Activities form. (Tr. at 268-70.) She opined that Claimant has moderate and marked limitations in the areas of making occupational adjustments, making performance adjustments, and making personal social adjustments. (Tr. at 269-70.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ's residual functional capacity ("RFC") assessment was erroneous. (Pl.'s Br. at

11

3-9.)

The Commissioner counters that substantial evidence supports the ALJ's decision on the grounds that (1) the ALJ properly assessed Claimant's RFC; and (2) the ALJ properly considered Claimant's subjective complaints. (Def.'s Br. at 9-14.)

Discussion

Residual Functional Capacity

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity ("RFC") for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In this case, the ALJ determined that Claimant was capable of "a limited range of light work." (Tr. at 16.) Regarding nonexertional limitations, the ALJ found:

> She can occasionally climb, balance, stoop, kneel, crouch and crawl. She is to avoid concentrated exposure to extreme cold and vibration. She has "marked" limitations in her ability to: relate to co-workers; deal with the public; interact with supervisors; deal with work stressors; maintain attention and concentration; use judgment; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. The claimant has no driver's license.

(Tr. at 16-17.)

Claimant argues that the ALJ's RFC assessment did not comply with the requirements of Social Security Ruling ("SSR") 96-8p in that the ALJ did not consider the impact of her depression on functional ability. (Pl.'s Br. at 3-5.) Contrary to Claimant's assertions, the ALJ's decision comported fully with SSR 96-8p,

13

which provides that

> [n]onexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions. . . . [N]onexertional capacity must be expressed in terms of work-related functions. . . . Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.

SSR 96-8p, 61 FR 34474, 34477 (1996). Indeed, the ALJ expressly incorporated into his RFC assessment all but two of the eleven marked limitations identified by Ms. Reynolds on the Mental Assessment of Ability to do Work-Related Activities form. (Tr. at 16-17, 268-70.)

Claimant also argues that the ALJ's RFC assessment deviated from the "narrative discussion" requirements of SSR 96-8p. (Pl.'s Br. at 5-7.) Under these requirements,

> [t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule [FN7]), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

14

SSR 96-8p at 34478. Footnote 7 of SSR 96-8p states that "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." Id. The ALJ's decision contains the requisite narrative discussion, including specific clinical and laboratory findings of record as well as Claimant's self-reported symptoms and daily activities. (Tr. at 16-20.)

Accordingly, the court finds that the ALJ's RFC assessment meets the requirements of SSR 96-8p and is supported by substantial evidence of record.

In addition, Claimant suggests tangentially that the ALJ erred in discrediting her subjective complaints of pain and depression and in weighing the opinions of Ms. Reynolds and treating sources. (Pl.'s Br. at 6-9.) The court finds no merit to either of these arguments.

With respect to Claimant's argument that the ALJ wrongfully evaluated her credibility, the court finds that the ALJ properly weighed Claimant's subjective complaints in keeping with the applicable regulations, case law, and SSR and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

The ALJ determined that Claimant had medically determinable

15

impairments that could cause her alleged symptoms. (Tr. at 18.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 17-20.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. Id.

In arguing that the ALJ committed reversible error in weighing the opinions of Claimant's treating and examining sources, Claimant implies that the ALJ used the words "little, if any" to describe the weight which he afforded to those sources. (Pl.'s Br. at 5.) In fact, the ALJ's decision contains no such language. Even if it did, the court finds that the ALJ's decision reflects adherence to the applicable regulations and that substantial evidence supports the weight which the ALJ afforded to the medical source opinions. See 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006).

Conclusion

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this

day, the Plaintiff's Motion for Judgment on the Pleadings is DENIED, Defendant's Motion for Judgment on the Pleadings is GRANTED, the final decision of the Commissioner is AFFIRMED, and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: March 21, 2008

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge